# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| ANTHONY COLLINS, | Case No. 17-CV-4534 (NEB/SER) |
| Plaintiff, | |
| v. | ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| ABBOTT LABORATORIES, INC. f/k/a ST. JUDE MEDICAL, INC., | |
| Defendant. | |

Plaintiff Anthony Collins ("Collins") brought this suit against Defendant Abbott Laboratories Inc. f/k/a St. Jude Medical, Inc. ("Abbott") claiming discrimination under the Family and Medical Leave Act ("FMLA"), and disability discrimination and a failure to accommodate under the Minnesota Human Rights Act ("MHRA"). Abbott moved for summary judgment on all the claims. [*See* ECF No. 61.] Collins conceded at oral argument that Abbott is entitled to summary judgment on the FMLA claim and the MHRA disability discrimination claim, leaving only the reasonable accommodation claim for the Court's review. For the reasons that follow, Abbott's motion for summary judgment on the reasonable-accommodation claim is granted.

## BACKGROUND

**I.      M & I Specialist Position**

Collins worked as a materials and inventory specialist ("M&I Specialist") at Abbott in Minnetonka, Minnesota. [ECF. No. 64 ("Markison Decl.") Exs. 1, 2, 3 ("Collins Dep.") at 93:12-21.] M&I Specialists support production-line employees by ensuring stock is available for Abbott's production lines. (Markison Decl., Exs. 4 ("Brink Dep.") at 49:5-10; 5 ("Job Description").) M&I Specialists are also responsible for maintaining, processing, and shipping medical-device components. (*Id.*) They typically work in four different buildings at the Minnetonka location, regularly moving between them to meet staffing and production needs. (Markison Decl., Ex. 6 ("Duerre Dep.") at 11:18 – 12:8.)

The M&I Specialist position is physically active. The required job duties include performing "Material Movements both physically and systematically" and operating "material handling equipment including potential use of forklifts or other equipment with appropriate training and/or certification." (Job Description at 1.) According to the job description, the job requires employees to push or pull 10–50 pounds frequently, stand and walk continuously, and lift or carry items up to 20 pounds frequently and 21-50 pounds occasionally. (Job Description at 4.) The job description includes a note that these written requirements "are intended to describe the general nature and level of work being performed by people assigned to this job. (*Id.*) "They are not intended to be an

exhaustive list of all responsibilities, duties, and requirements, which may change from time to time based on business needs." (*Id.* at 3.)

The main function of M&I Specialists is to move pallets of materials within the Abbott warehouses. (Brink Dep. 23:19-21.) To do this, M&I Specialists use both manual pallet jacks and electric forklifts.[1] (Markison Decl., Ex. 7 ("Vasecka Dep.") at 21:6-15; Duerre Dep. 43:6-13.) Each piece of equipment operates differently and with a different purpose. A manual pallet jack lifts pallets several inches above the ground; it is moved manually by pushing or pulling the jack. (Collins Dep. at 104:12-16.) An electric forklift is used to lift pallets onto higher shelves once they have been moved (typically by a manual pallet jack) to a certain floor location within the warehouse. (Duerre Dep. 44:10-45:21, 48:2-23; Brink Dep. 23:13-24:7, 28:19-29:1, 56:11-57:1.) Electric forklifts are battery-operated and need to be charged regularly, a process that can take several hours. (Collins Dep. 104:21-105:9, 210:3-212:3.) In one of the four buildings where M&I Specialists work,

---

[1] The terminology here is confounding but important. First, the parties appear to use the terms "electric forklift," "walk-behind forklift," and "electric lift" interchangeably for the same piece of equipment. The Court will use "electric forklift." Second, the record reflects significant confusion between electric forklifts and "electric pallet jacks." [*See* ECF No. 72 ("Collins Decl.") ¶ 4.] While an electric pallet jack is apparently a real piece of equipment, Abbott does not own one. Collins asserts that in his deposition he mistakenly referred to electric forklifts as electric pallet jacks. (*Id.* ¶ 6.) The Complaint also refers to "electronic pallet jacks." [ECF No. 1, Ex. A ¶ 32.] And further confusing the issue is Collins's contention, made for the first time at oral argument, that Abbott should purchase an electric pallet jack as a reasonable accommodation. That argument is not in the briefs or the record. There is no indication the parties ever discussed the purchase of new equipment as a reasonable accommodation. The Court will not consider the late-made argument.

no electric forklift is available. (Brink Dep. 16:14-15, 36:6-8; Duerre Dep. 26:11-18, 34:14-16, 47:4-18; Collins Decl.)

In addition to moving pallets, M&I Specialists perform other tasks, such as handling, counting, and "kitting" small items in the "Clean Room," as well as confirming, prepping, and backflushing orders. (Duerre Dep., 14:21–15:16, 17:21-23; Collins Dep., 99:8-12; Vasecka Dep. 30:14-23). According to Michael Duerre, Abbott's Inventory and Warehousing Supervisor, M&I Specialists staff the clean rooms, but there are no employees specifically dedicated to work in the warehouses' clean rooms. (Duerre Dep. 19:21-20:25; *see also* Markison Decl., Ex. 22 ("Khan Dep.") 31:21-23, Markison Decl., Ex. 9 ("Ross Dep.") 38:19-20.)

**II.     Disability**

In June 2016, Collins was diagnosed with mild-to-moderate osteoarthritis of the right knee. (Markison Decl., Ex. 10; Collins Dep. 139:17-24.) On August 29, 2016, Collins was using a manual pallet jack, and felt a tingle run down his right leg. (Collins Dep. 105:15-24.) Collins immediately stopped using the jack and reported the injury to his team lead. (Collins Dep. 73:3-12.) He visited a doctor the next day, August 30, 2016, because he thought the tingling may be related to his arthritis, but the doctor diagnosed the cause as an issue with Collins's S1 vertebra. (Collins Dep. 110:4-15, 138:1-13.) The same day, the doctor signed a note stating that Collins was not to lift, push, or pull more than 25 pounds. (Markison Decl., Ex. 15.)

4

Collins then returned to work and was temporarily assigned first to labeling boxes, and then to the clean room. (Collins Dep. 69:18-20; 70:11-13.) Collins stayed in the clean room assignment for three weeks. (*Id.* at 99:8-12.) During Collins's time in the clean room, he visited his primary care doctor and was given new work restrictions—not to lift more than 15 pounds, not to stand more than one hour or for extended periods of time, and to perform only light duty work. (Markison Decl., Ex. 16.)

When Abbott received Collins's work restrictions, Human Resource Generalist Aisha Khan met with Collins to determine if he could continue in the M&I Specialist role with the restrictions in place, and to discuss any potential accommodations. (Collins Dep. 125:22-126:3; Khan Dep. 15:7-18:15.) The meeting took place on October 5, 2016. Khan asked Collins what accommodations he needed, and Collins requested to remain in the clean room. (Collins Dep. 125:22-126:25; Khan Dep. 16:21-17:8.) Indeed, Collins asserts that his supervisor Michael Duerre told him that he could be permanently placed in the clean room. (Collins Dep. 134:18–135:1.) But working in the clean room was not a discrete position or a full-time job. (Khan Dep. 33:1-5; Markison Decl., Ex. 9 ("Ross Dep.") 38:19-20; Collins Dep. 121:19-122:1.) As Duerre testified, the clean room tasks were only part of the M&I Specialist job. (Duerre Dep. 18:21-23:4; 58:3-12.) With only 40-45 M&I Specialists to support 800-900 production-line employees, having an M&I Specialist work exclusively in the clean room would "silo" the employees and be detrimental to production. (Brink Dep. 48:19-49:10.) In a second meeting with Collins after a

5

conversation with Duerre, Khan informed Collins that working in the clean room was not a full-time job. (Khan Dep. 21:17-22:9.) Khan asked Collins whether any other accommodations would allow him to perform his duties, and Collins stated he was not aware of any. (Markison Decl. Ex. 23.) Kahn told Collins that although his medical restrictions rendered him unable to perform the essential functions of the M&I Specialist role, since his restrictions were temporary, a (temporary) leave was a possible accommodation. (Khan Dep. 30:1-31:2; Markison Decl., Ex. 23.)

Abbott thus placed Collins on a temporary leave until December 28, 2016, the date it expected Collins would be able to return and perform all the essential duties of his position. (Markison Decl., Exs. 19, 21, 23.) Abbott sent a letter confirming that the leave was an accommodation for Collins's disability, and that he could return to work if an accommodation for his work restrictions could be found. (Markison Decl., Ex. 23.)

Abbott extended Collins's leave several more times in response to work restrictions submitted by his doctors. On November 29, 2016, a doctor updated Collins's work restrictions and stated he could perform between 60–80% of his duties, but that he was not to lift more than 30 pounds, and was not to use a manual pallet jack. (Markison Decl., Ex. 24.) That doctor noted Collins's expected return date as January 29, 2017. (*Id*.) Abbott extended his leave until then. (Markison Decl., Ex. 25.)

On January 30, 2017, Collins's updated work restrictions no longer restricted lifting, pushing, or pulling; a doctor simply prohibited use of a manual pallet jack for six

6

months. (Markison Decl., Ex. 27.) In response, Abbott extended his leave for six months. (Markison Decl., Ex. 28.) On August 3, 2017, Collins's updated work restrictions again required no manual pallet jack use. Abbott first responded by extending Collins's leave one more time. (Markison Decl., Ex. 33.) Then, Abbott determined that it was unclear if Collins would ever be able to use a manual pallet jack. (Markison Decl., Ex. 34.) Since use of the manual pallet jack was an essential requirement of the job, on August 23, 2017, Abbott terminated Collins's employment. (*Id.*)

On September 13, 2017, Collins filed a Complaint in state court, which Abbott removed to federal court. Collins alleges three causes of action against Abbott: (1) violation of the Family and Medical Leave Act; (2) discrimination in violation of the Minnesota Human Rights Act; and (3) failure to provide a reasonable accommodation in violation of the Minnesota Human Rights Act. [*See* ECF No. 1, Ex. A ¶¶ 45-72.]

## ANALYSIS

### I. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the litigation under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a

7

fact is "genuine" only if "the evidence is such that a reasonable jury could . . . return a verdict for [the non-movant]." *Baucom v. Holiday Co.*, 428 F.3d 764, 766 (8th Cir. 2005).

In considering a motion for summary judgment, the court must resolve factual disputes in favor of the nonmoving party. *See Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987). To avoid summary judgment, the nonmovant must present enough facts "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Evidence is not "sufficient" unless a reasonable jury could return a verdict for the nonmovant. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

## II.     Abbott is entitled to summary judgment on Counts I and II.

Collins does not oppose Abbott's motion for summary judgment with respect to Count I of his Complaint (FMLA discrimination). (*See* Pl. Mem. in Opp'n, at 12 n.3.) Further, Collins did not address his MHRA disability discrimination claim in his brief and conceded that summary judgment was appropriate at oral argument, so Abbott's motion for summary judgment is unopposed with respect to this claim. Abbott's motion for summary judgment on these two claims is granted.

## III.    Failure to Accommodate under the MHRA

Collins's remaining claim is that Abbott failed to provide him with a reasonable accommodation for his disability as required by the MHRA. Because the MHRA and the Americans with Disabilities Act ("ADA") are similar, the Court looks to federal case law when analyzing MHRA claims. *Gee v. Minnesota State Colleges & Univ.*, 700 N.W.2d 548, 553 (Minn. Ct. App. 2005). The Court applies a "modified burden-shifting analysis" to reasonable-accommodation claims and the plaintiff does not need to show discriminatory intent by the employer to succeed. *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074 (8th Cir. 2006).

Both the ADA and the MHRA prohibit employers from discriminating against qualified individuals on the basis of disability. *See* 42 U.S.C. § 12112(a); Minn. Stat. § 363A.08, subd. 2. To survive a motion to dismiss on a reasonable-accommodation claim, Collins "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). He must show that he "(1) is disabled within the meaning of the statute; (2) is a qualified to perform the essential functions of the job (either with or without reasonable accommodation); and (3) has suffered an adverse employment decision because of the disability."[2] *Id.* (quoting *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th

---

[2] The MHRA defines a disabled person as "any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Minn. Stat. § 363.03, subd. 12. Historically, the MHRA has been slightly more lenient than the ADA in terms of the degree to which a person must be impaired before his condition is

Cir. 2012). He must further show "that his employer knew of, and failed to reasonably accommodate, his disability." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004).

A.   **Disability**

Collins first argues that he has established a prima facie case of failure to accommodate because he was actually disabled and qualified to perform the essential functions of his job. A "'qualified disabled person' means: . . . a disabled person who, with reasonable accommodation, can perform the essential functions required of all applicants for the job in question." Minn. Stat. § 363A.03, subd. 36(1); *see also McBee v. Team Indus., Inc.*, 925 N.W.2d 222, 230 (Minn. 2019).[3]

---

considered a disability. Nevertheless, the courts of the Eighth Circuit have consistently analyzed claims under the MHRA disability provision as analogous to claims under the ADA. *See, e.g., Brunckhorst v. City of Oak Park Heights*, 283 F. Supp. 3d 746 (D. Minn. 2017), *aff'd*, 914 F.3d 1177 (8th Cir. 2019), *reh'g denied* (Mar. 21, 2019); *Cover v. J.C. Penney Corp., Inc.*, 187 F. Supp. 3d 1079 (D. Minn. 2016); *Miners v. Cargill Comm., Inc.*, 113 F.3d 820 (8th Cir. 1997), *cert. denied*, 522 U.S. 981 (1997); *Roberts By and Through Rodenberg–Roberts v. KinderCare Learning Centers, Inc.*, 86 F.3d 844 (8th Cir. 1996).

[3] After oral argument, Collins submitted the recent *McBee* opinion as supplemental authority. [ECF No. 81.] In *McBee*, the Minnesota Supreme Court held that summary judgment in favor of an employer on an employee's reasonable-accommodation claim was error, finding a genuine issue of material fact over whether changing ram tips and cleaning pits out of die-casting machines were essential job duties. 925 N.W.2d at 231-233. In *McBee,* the employee testified that she only changed the ram tips twice in six months and that a lighter shovel could be used for cleaning the pits. *Id.* Collins has no similar support in the record. The record reflects that Collins had to use a manual pallet jack *every day*. Even if that usage was only 5% of the time as Collins asserts, "a task may be an essential function even if the employee performs it for only a few minutes each week, and even if other employees are available to perform the task for the disabled

Abbott argues that as of January 29, 2017, Collins was no longer disabled. [*See* ECF No. 74 ("Def. Reply") at 2.] Collins appears to agree, arguing that his disability was temporary, and that he "was substantially limited in his major life activities of lifting and standing for approximately five months," referring to the period from August 2016 through January 2017. After that, while Collins was restricted from using a manual pallet jack, he was not restricted in any movements that the manual pallet jack might require, like lifting, carrying, pushing, pulling, bending, twisting, squatting, kneeling, climbing, standing, walking, or reaching above or below the knee.

Thus, it is undisputed that after January 2017, Collins's disability ended. Collins asserts that after January 2017, though he was no longer disabled, he "was qualified to perform the essential functions of his job [with accommodations]."[4] (Pl. Mem. in Opp'n

---

employee." *Minnihan v. Mediacom Comm.*, 779 F.3d 803, 812 (8th Cir. 2015), *aff'd* 902 F.3d 891 (8th Cir. 2018).

[4] Collins argued for the first time at oral argument that he remains materially limited in his major life activities of standing and bending. This argument is not in his briefing and it is unsupported by the record. In a follow-up email correspondence to the Court after the conclusion of the hearing, Collins points to portions of his deposition where he testified he could no longer play basketball or stand for long periods of time. (Collins Dep. 162:16-164:9.) In the same post-hearing correspondence, Collins asserts that his deposition contained testimony regarding his work at Home Depot and standing for long periods of time there. After a thorough reading of Collins's deposition testimony, the Court is unable to locate this line of questioning. Not surprisingly, Abbott objects to the Court's consideration of Collins's February 8, 2019 letter as procedurally improper, and it is. [ECF No. 81.] The letter was not filed and, as such, is not a part of the official record. The Court need not consider it, but even if considered, it does not change the Court's analysis of the reasonable-accommodation claim.

at 16.) Abbott argues that since he was reasonably accommodated by a leave up to January 2017, and that he was not disabled thereafter, summary judgment is required.[5]

Assuming Collins's reasonable-accommodation claim only covers January 2017 forward, Abbott's analysis is correct, and summary judgment would be appropriate on this basis alone. But it is not clear to the Court that Collins limits his claim to events after January 2017. Collins's complaint states that his unpaid leave prior to January 2017 was not a reasonable accommodation, and that he should have been accommodated by working in the clean room or using an electric forklift instead of a manual pallet jack. Collins's brief focuses on the argument that use of the manual pallet jack was not an

---

[5] Collins argued, again for the first time at oral argument, that a reasonable accommodation may be necessary after an actual disability has resolved if it relates back to the original disability. Collins asserts that under the ADA Amendments Act of 2008 ("ADAAA"), an impairment "is not categorically excluded from being a disability simply because it is temporary" and, thus, that Collins's knee injury and restrictions, undisputedly occurring from August 2016 through January 2017, were a temporary impairment sufficient to allege a prima facie case of discrimination based on a disability. *See Summers v. Altarum Inst., Corp.*, 740 F.3d 326, 333 (4th Cir. 2014). The regulations under the ADAAA contemplate this relation-back theory of reasonable accommodation when an individual has a *record of* disability. 29 C.F.R. § 1630.2(k)(3). However, there is no similar provision in the regulations for a person who is actually disabled, as Collins claims he is. *See* 29 C.F.R. § 1630.2(h); *Willis v. Noble Envtl. Power, LLC*, 143 F.Supp.3d 475, 480 (finding that for a claim of actual disability, the disability must exist at the time of the adverse employment action). Further, one of the cases cited by Collins to support this proposition directly contradicts the claim that for an actual disability claim he does not need to be simultaneously disabled and qualified. *Farina v. Branford Bd. of Educ.*, 2010 WL 3829160, *11 (D. Conn Sept. 23, 2010) (The court did not need to determine whether plaintiff's lifting restrictions constituted a disability because there was no evidence that those restrictions continued to affect plaintiff during the relevant period). The Court finds Collins's argument in this respect unavailing.

essential function of the job, that his "involuntary, unpaid leave" was not a reasonable accommodation, and that use of the electric forklift would have been a reasonable accommodation—all arguments that apply to events both before and after January 2017. Thus the fact that Collins was not disabled after January 29, 2017 is not necessarily dispositive, and the Court considers other arguments below.

**B.     Essential Function**

The question argued by the parties is whether use of a manual pallet jack is an essential function of the M&I Specialist position.[6] Generally, "essential functions" are "the fundamental job duties of the employment position...." 29 C.F.R. § 1630.2(n)(1) (2018); *McBee*, 925 N.W.2d at 230–31. Whether a job function is essential is determined on a case-by-case basis. "[T]he essential function requirement focuses on the desired result rather than the means of accomplishing it." *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 280 (3rd Cir. 2001) (citation omitted). Factors to consider include: "(1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before

---

[6] Prior to January 2017, Collins's restrictions were primarily related to weight he could push, pull, or lift. [ECF No. 63 at 24.] After January 2017, Collins was no longer restricted in terms of the weight he could handle, but he was restricted from using the manual pallet jack. There appears to be no question or argument from Collins that prior to January 2017, he was restricted from performing essential functions of the job—pulling, lifting, and pushing various weights in order to move materials. The question for pre-January 2017 then becomes whether he could have been reasonably accommodated. The question for post-January 2017 is (1) whether he was disabled (he agrees he was not) and even assuming he was disabled, (2) whether use of the manual pallet jack was an essential function of the job, and (3) whether a reasonable accommodation existed to get around the use of the manual pallet jack.

advertising or interviewing applications of the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs." *Kammueller*, 383 F.3d at 786. An employer's judgment of the essential functions is probative, but not conclusive. *Id.*

There is simply no evidence in the record supporting the position that use of a manual pallet jack is not an essential function of Collins's job. Undisputedly, the job description for M&I Specialists includes the operation of material handling equipment, such as forklifts or other equipment, and the frequent pushing or pulling of 11 to 50 pounds. The Job Description does not specifically name manual pallet jacks under "forklifts or other equipment," and Collins asserts this omission creates a material fact dispute. The Court has scoured the record, and every statement from company representatives and Collins's co-workers indicates that material handlers need to be able to use manual pallet jacks. (Brink Dep. 23:13-24:7, 28:19-29:1, 56:11- 57:1; Duerre Dep. 31:4-32:8, 44:10-45:21, 46:5-47:12, 47:22-48:23, 49:7-23, 65:6-66:6; Ross Dep. 29:7-16, 35:22-37:5, 45:21-22, 71:12-72:9, 82:24-83:22, 85:1-86:3, 100:4-20; Ex 8.) *See Minnihan*, 779 F.3d 803, 812 (8th Cir. 2015), *aff'd* 902 F.3d 891 (8th Cir. 2018) ("While the ability to drive is not specifically listed, the TOS job description states "[v]alid driver's license with good driving *required.*"); *Dropinski v. Douglas Cnty., Neb.*, 298 F.3d 704, 708–09 (8th Cir. 2002) (finding certain job functions were essential, even though they were not listed in the

written job description, because they were inherently required to perform the written job functions); *Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 914 (8th Cir. 2013) (employer's judgment about an essential job function is considered highly probative). Collins's assertion that use of the manual pallet jack is not an essential function does not create a material fact dispute.

C.      **Reasonable Accommodation**

The question then becomes whether a reasonable accommodation existed to get around the necessary use of the manual pallet jack. In a reasonable accommodation claim, the burden is originally on the employee to "make a facial showing that reasonable accommodation is possible." *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999). When a qualified, disabled individual makes a request, the burden shifts to the employer to show "it was reasonable to conclude that the disabled employee could not have met the requirements of the job, even with a reasonable accommodation." *Mallon v. U.S. Physical Therapy, Ltd.*, 395 F.Supp.2d 810, 819 (D. Minn. 2005) (citing *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 547 n.10 (Minn. 2001)). Under the MHRA, a reasonable accommodation includes "job restructuring, modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, and the provision of aides on a temporary or periodic basis." *Id.* (quoting Minn. Stat. § 363A.08 subd. 6). Job restructuring does not require an employer to "reallocate or eliminate the essential functions of a job to accommodate a disabled employee." *Fjellestad*,

15

188 F.3d at 950. An employer may also defeat a reasonable accommodation claim "by showing that the accommodation would impose an undue hardship on the business." *Mallon*, 395 F.Supp.2d at 819.

Collins proposes two alternative accommodations: working full-time in the clean room and using an electric forklift. But working full-time in the clean room is not an existing full-time job at Abbott. Employers do not need to create a new position or create a permanent position out of a temporary one as an accommodation. *See, e.g.*, *Fjellestad*, 188 F.3d at 950 ("[T]he ADA does not require an employer to create a new position to accommodate a disabled employee or to shift the essential functions of the position to other employees. . . . Neither is Pizza Hut required to create a new position or to create a permanent position out of a temporary one as an accommodation."); *Sharbono v. N. States Power Co.*, 218 F. Supp. 3d 1004, 1016 (D. Minn. 2016) ("[B]y [the plaintiff's] logic an employer would be obligated to create a new position for an employee when no other accommodation was possible. That is clearly not the law.") (citing *Minnihan*, 779 F.3d at 814). It is undisputed that working in the clean room is not currently a discrete position, and Abbott is not required to create such a position.

And using an electric forklift instead of a manual pallet jack is not a reasonable accommodation on the record before the Court, nor is there a material fact dispute about that. Although Collins claims that an electric forklift can be substituted for a manual pallet jack in all cases, this assertion is wholly unsupported, and in fact directly

contradicted, by the record. Collins argues that "[i]t is undisputed that every single building at the Abbott facility had electric lifts that [M&I Specialists] used daily, and almost continuously, to do their jobs. There was no task that required the use of a manual pallet jack that could not be performed with the use of an electric lift instead." (Pl. Mem. in Opp'n at 2.) This argument misstates the record, because one of the buildings is too small for an electric forklift. (Brink Dep. 30:8-11; Duerre Dep. 26:8-25.) Further, the record is replete with valid logistic and safety concerns about using an electric forklift in the manner Collins suggests. (Brink Dep. 12:22-13:1, 13:7-10; *see also* Duerre Dep. 31:4-32:8, 34:14-25, 37:3-12; Markison Decl., Ex. 8.) As but one example, Collins conceded at his deposition that the electric forklifts were often unavailable for moving pallets on the floor because that type of continuous use would drain their batteries, making them unavailable when needed for their intended use of lifting pallets onto shelving. (Collins Dep. at 104:25-105:12, 210:3-212:3.4.) Use of electric forklift to accomplish the M&I Specialist position's job duties is simply not feasible, and the only portion of the record asserting otherwise is Collins's affidavit.

Collins asserts that he has created a disputed issues of material fact in that (1) Ellen Ross admitted that using an electric forklift was a reasonable accommodation (Ross Dep. 79:19-80:1), and (2) Abbott accommodated another employee's 15-pound lifting restriction by allowing her to perform the tasks of prepping, backflushing, and confirming orders. (Duerre Dep., 13:18–16:12, 67:23-69:4, 71:6-14.)

17

First, Collins misconstrues Ellen Ross's testimony. The full colloquy at issue spans from approximately page 72 to page 80, and includes a hypothetical question in which Collins's counsel had Ross assume that Michael Duerre had lied to her about the availability of an electric pallet jack in Abbott's warehouses. (*See* Ross Dep.) An answer to this hypothetical question is not sufficient to create a material factual dispute. Both Ross and Duerre testified consistently that neither an electric pallet jack nor an electric forklift was available to accommodate Collins.

Second, Collins comparator assertion does not hold up. The employee he wishes to compare suffered a compensable injury under Minnesota's Workers' Compensation Act, which requires employers to reassign injured employees to other available positions. *See* Minn. Stat. § 176.82, subd. 2. The MHRA does not impose similar requirements for disabled employees. And that employee's restriction is distinguishable because it was a 15-pound lifting restriction, not a restriction on using a singular piece of necessary equipment (the manual pallet jack). Evidence in the record of another employee who was accommodated through the Minnesota Worker's Compensation Act for a different issue does not create a genuine material factual dispute in this case.

In short, Collins has not created a material fact dispute over the manual pallet jack, use of which is an essential function of his job. Nor has he created a material fact dispute over the reasonable accommodation, because the record contains no suggestion of an

accommodation that would have been reasonable. Abbott's motion for summary judgment on Collins's MHRA reasonable-accommodation claim is granted.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion for Summary Judgment [ECF No. 61] is GRANTED; and

2. This action is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: June 28, 2019                                BY THE COURT:


                                                    s/Nancy E. Brasel
                                                    Nancy E. Brasel
                                                    United States District Judge